## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 24-CR-398 (DLF) |
| | : | |
| DONALD ROSS WORKMAN, JR., | : | |
| | : | |
| Defendant. | : | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COUNT ONE OF THE INDICTMENT

The United States opposes Defendant's Motion to Dismiss Count One of the Indictment, which alleges a violation of the civil disorder statute, 18 U.S.C. § 231(a)(3) ("Section 231(a)(3)"). Defendant's motion levels various Commerce Clause, First Amendment, and vagueness challenges to Section 231(a)(3) that courts in this district and elsewhere have rejected.

Workman begins his motion with a legislative history lesson purporting to show that the statute was passed to target leaders of the civil rights movement.  He fails to present a persuasive argument that one senator's disdain for Martin Luther King, Jr. and Stokely Carmichael should invalidate the statute and bestow a benefit onto himself.  Such an argument would fail in any event, as Workman fails to connect the dots not just between himself and Reverend King, but between one senator and the intent of the entire Congress that passed Section 231 as part of the Civil Rights Act of 1968 (and later amended it).  For this and other reasons, his motion fails.

## BACKGROUND

The Court is familiar with the civil disorder that occurred on January 6, 2021 at the U.S. Capitol. As the government has proven in multiple January 6 trials, and will prove at trial in this case, the civil disorder obstructed, delayed, or adversely affected commerce, causing early closure of Safeway stores in the District of Columbia, resulting in a loss of revenue. It also obstructed,

delayed, or adversely affected a federally protected function; namely, Secret Service's protection of the Vice President.

Among the participants in the civil disorder on January 6, 2021 were defendants Workman and Clark. On January 6, 2021, the two defendants walked to the U.S. Capitol building while Workman filmed a livestream-video. Workman repeatedly alluded to violence, stating that "there's a bunch of very unserious people here who are all happy to wave flags and cheer, and then there's a much smaller percentage of us who are very pissed off and going to the Capitol building." Once on Capitol grounds, Workman and Clark chased U.S. Capitol Police (USCP) officers who were running down a walkway. Workman pushed a USCP officer who attempted to prevent the defendants from moving closer towards the Capitol building. When the officer pushed Workman back, Clark shoulder-checked the officer. Workman and Clark were amongst the first rioters to breach the police line by the Maryland Avenue walkway. After that breach, and over the course of more than 70 minutes, Workman, Clark, and other rioters, tried to break police lines, grabbing at barricades even as police deployed chemical irritants in efforts to push back the rioters.

For their actions on January 6, Workman and Clark were arrested on August 19, 2024. ECF Nos. 5, 6. They currently stand charged by an indictment. ECF No. 15. Count One of that indictment alleges that the defendants violated the civil disorder statute, 18 U.S.C. § 231(a)(3). *Id.* It states:

> On or about January 6, 2021, within the District of Columbia, DONALD ROSS WORKMAN, JR. and JOHN WALTER CLARK IV committed and attempted to commit an act to obstruct, impede, and interfere with a law enforcement officer lawfully engaged in the lawful performance of his/her official duties incident to and during the commission of a civil disorder which in any way and degree obstructed, delayed, and adversely affected commerce and the movement of any article and commodity in commerce and the conduct and performance of any federally protected function.

On December 17, 2024, Workman moved to dismiss Count One. ECF No. 25.

## LEGAL STANDARD

Federal Rule of Criminal Procedure 7(c)(1) states, in relevant part, that "[t]he indictment … must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). An indictment is sufficient under the Constitution and Rule 7 if it "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend." *Hamling v. United States*, 418 U.S. 87, 117 (1974). This may be accomplished by "echo[ing] the operative statutory text while also specifying the time and place of the offense." *United States v. Williamson*, 903 F.3d 124, 130 (D.C. Cir. 2018). An indictment need not inform a defendant "as to every means by which the prosecution hopes to prove that the crime was committed." *United States v. Haldeman*, 559 F.2d 31, 124 (D.C. Cir. 1976). As such, "the validity of an indictment 'is not a question of whether it could have been more definite and certain.'" *United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014) (quoting *United States v. Debrow*, 346 U.S. 374, 378 (1953)).

A defendant may move to dismiss an indictment or count prior to trial. *See* Fed. R. Crim. P. 12(b)(3)(B). A pretrial motion may challenge "a defect in the indictment or information" if "the basis for the motion is then reasonably available and the motion can be determined *without a trial on the merits*." *Id.* (emphasis added). Although a court's supervisory powers provide the authority to dismiss an indictment, "dismissal is granted only in unusual circumstances." *United States v. Ballestas*, 795 F.3d 138, 148 (D.C. Cir. 2015). Indeed, "[i]f contested facts surrounding the commission of the offense would be of *any* assistance in determining the validity of the motion, Rule 12 doesn't authorize its disposition before trial." *United States v. Pope*, 613 F.3d 1255, 1259 (10th Cir. 2010) (Gorsuch, J.). An "indictment must be viewed as a whole" and the "allegations must be accepted as true" in determining if an offense has been properly alleged. *United States v. Bowdoin*, 770 F. Supp. 2d 142, 146 (D.D.C. 2011). The operative question is whether the

allegations, if proven, would be sufficient to permit a jury to find that the crimes charged were committed. *Id.*

The statute at issue in Workman's motion, 18 U.S.C. § 231(a)(3), provides:

> Whoever commits or attempts to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function—Shall be fined under this title or imprisoned not more than five years, or both.

The term "commerce" is further defined as "commerce (A) between any State or the District of Columbia and any place outside thereof; (B) between points within any State or the District of Columbia, but through any place outside thereof; or (C) wholly within the District of Columbia." 18 U.S.C. § 232(2). And "civil disorder" is defined as "any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual." 18 U.S.C. § 232(1).

## ARGUMENT

Workman's interstate commerce, First Amendment, and vagueness challenges to Section 231 all fail. Congress's plenary authority over the District of Columbia justifies its regulation of civil disorders there, regardless of the nexus to interstate commerce; that nexus, however, is sufficiently robust to justify commerce-clause regulation. Section 231 targets conduct, not speech, and is content-neutral, and Workman does not show it was passed for a discriminatory purpose, defeating his First Amendment claim. Finally, the statute's actus reus and mens rea elements, among other factors, defeat any vagueness challenge, and the indictment meets pleading requirements and does not run afoul of the Due Process Clause. Courts have rejected each of these claims in the January 6 context. *See, e.g., United States v. Nordean*, 579 F. Supp. 3d 28, 57-58 (D.D.C. 2021) (vagueness, overbreadth); *United States v. Mostofsky*, 579 F. Supp. 3d 9, 16–23

(D.D.C. 2021) (commerce, overbreadth); *United States v. McHugh,* 583 F. Supp. 3d 1, 28-29

(D.D.C. 2022) (vagueness, overbreadth); *United States v. Grider*, 617 F. Supp. 3d 42, 50-53

(D.D.C. 2022) (commerce, overbreadth); *United States v. GossJankowski*, No. 21-CR-123 (PLF),

2023 WL 130817, at *11-14 (D.D.C. Jan. 9, 2023) (vagueness, overbreadth, Fifth Amendment);

*United States v. Williams*, No. 21-CR-618 (ABJ), 2022 WL 2237301, at *2-8 (D.D.C. Jun. 22,

2022) (vagueness, overbreadth, Fifth Amendment); Apr. 7, 2023 Minute Entry, *United States v.*

*Wren*, No. 21-cr-599 (RBW) (commerce, overbreadth, First Amendment, vagueness).  This Court

should do the same here.

## I. Workman's Commerce Clause Challenge Fails Because Section 231 Fits Within Congress's Authority to Regulate Commerce in the District of Columbia and Interstate Commerce.

Workman asks the Court to dismiss Count One because, he claims, Section 231(a)(3)

exceeds Congress's ability to regulate interstate commerce. His challenge ignores the fact that

Congress's plenary authority over the District of Columbia, not its power to regulate interstate

commerce, independently justifies the statute's application here, where the criminal activity took

place in D.C. While the Court need not even reach Workman's interstate commerce argument, that

argument fails, as the statute includes an express jurisdictional element, and civil disorders have a

self-evident effect on interstate commerce.

Workman's motion also ignores the fact that Section 231(a)(3) is "a so-called 'divisible

statute' … [that] sets out one or more elements of the offense in the alternative." *Descamps v.*

*United States*, 570 U.S. 254, 257 (2013). Here, separate from civil disorders affecting commerce,

Section 231(a)(3) also criminalizes civil disorders that obstruct or adversely affect a "federally

protected function." 18 U.S.C. § 231(a)(3). Thus, even if the Court were to agree with Workman's

view, the remedy would not be dismissal; the case could proceed with the federally protected

function jurisdictional hook instead.

A.    **Congress's Plenary Authority over the District of Columbia Independently Justifies the Regulation of Civil Disorders Affecting Commerce Here.**

Workman contends that § 231(a)(3) violates the Commerce Clause of Article I, Section 8, Clause 3, which gives Congress the "[p]ower ... [t]o regulate Commerce ... among the several States." U.S. CONST. art. I, § 8, cl. 3. ECF No. 25 at 14-26. That claim is both misdirected and meritless because Congress's power under the Commerce Clause is not at issue in this case. Instead, Congress's plenary power to regulate commerce in the District of Columbia justifies the statute, as Judge Kollar-Kotelly has recognized. *Grider*, 617 F. Supp. 3d at 50.

In addition to its limited power to regulate foreign and interstate commerce under Clause 3, Congress has plenary power under Article I, Section 8, Clause 17, to legislate regarding matters affecting the District of Columbia. Congress exercised its Clause 17 power in 18 U.S.C. 231(a)(3), which prohibits, inter alia, obstructing police officers performing their official duties during a civil disorder which has "any effect whatsoever" on commerce "within the District of Columbia." *See* 18 U.S.C. § 232(2)(C).

Workman does not address Congress's Clause 17 power, but only its power to regulate interstate commerce under Clause 3. Congress's power under Clause 3, unlike its power under Clause 17, is bounded by the power of every state to regulate wholly intrastate commerce. Congress's Clause 17 power to regulate not only commerce but matters within the government's police powers with respect to the District of Columbia is not constrained by the power of the states. Workman's Commerce Clause challenge to the § 231(a)(3) charge for conduct he committed wholly inside the District of Columbia is therefore beside the point.

Regardless of whether § 231(a)(3) exceeds Congress's power under the Commerce Clause—and it does not—for cases such as Workman's involving criminal conduct committed within the District of Columbia, that statute fits comfortably within Congress's power under

Clause 17. It states:

> The Congress shall have Power . . . To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States....

U.S. Const. Art. I, § 8, Cl. 17.

Congress's power under Clause 17 "is plenary." *Palmore v. United States*, 411 U.S. 397 (1973). "Not only may statutes of Congress of otherwise nationwide application be applied to the District of Columbia, but Congress may also exercise all the police and regulatory powers which a state legislature or municipal government would have in legislating for state or local purposes." *Id*. "Congress 'may exercise within the District all legislative powers that the legislature of a state might exercise within the State … so long as it does not contravene any provision of the constitution of the United States.'" *Id*. (quoting *Capital Traction Co. v. Hof*, 174 U.S. 1, 5 (1899)). "Congress may legislate within the District for every proper purpose of government," and "[w]ithin the District of Columbia, there is no division of legislative powers such as exists between the federal and state governments." *Neild v. D.C.*, 110 F.2d 246, 249 (D.C. Cir. 1940) (citing *Kendall v. United States ex rel. Stokes*, 37 U.S. 524 (1838); *Atlantic Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427 (1932); and *O'Donoghue v. United States*, 289 U.S. 516 (1933)). "[W]hen it legislates for the District, Congress . . . exercise[es] complete legislative control as contrasted with the limited power of a state legislature, on the one hand, and as contrasted with the limited sovereignty which Congress exercises within the boundaries of the states, on the other." *Nield*, 110 F.2d at 250-51.

When enacting Section 231(a)(3), Congress relied on its Clause 17 power. "Commerce," as used in § 231(a)(3), "means commerce (A) between any State or the District of Columbia and any place outside thereof; (B) between points within any State or the District of Columbia, but

through any place outside thereof; or (C) *wholly within the District of Columbia*." 18 U.S.C. 18 U.S.C.A. § 232(2) (emphasis added). Regardless of whether Congress had authority under the Commerce Clause to regulate such conduct in jurisdictions other than the District of Columbia, it did not and could not exceed its "plenary authority" to exercise "police power" within the District of Columbia. *See generally Darnell v. Markwood*, 220 F.2d 374, 375–77 (D.C. Cir. 1954) (reversing dismissal of complaint under the Sherman Act, 15 U.S.C. §§ 1, 2, and 3, alleging that defendants "restrain[ed] interstate trade and commerce, and trade and commerce in the District" of Columbia; although defendants' activities wholly within the District of Columbia "do not come within the control of the Commerce Clause, or, therefore, within either Sections 1 or 2 of the Sherman Act, "Section 3 … is not dependent upon the Commerce Clause but rests upon the plenary legislative power of Congress within the District of Columbia").

Because Section 231(a)(3) was a valid exercise of Congress's Section 17 power, all of Workman's challenges to the commerce element of § 231(a)(3) are beside the point, because all are grounded upon limitations on Congress's power under Clause 3. See ECF No. 25 at 17 ("§ 231(a)(3) does not regulate activity that substantially affects interstate commerce"); *id*. ("Section 231(a)(3) does not regulate economic activity"); *id*. at 20 ("The jurisdictional element of § 231(a)(3) does not limit its reach to activities that substantially affect interstate commerce"); *id*. at 22 ("Congress did not find that § 231(a)(3)'s activities substantially affect interstate commerce"); *id*. at 24 ("The relationship between § 231(a)(3)'s activities and any effect on interstate commerce is too attenuated").

Even for criminal statues with nation-wide application that do not single out commerce within the District for special protection, as Section 232(2)(C) does with respect to Section 231(a)(3), Commerce Clause challenges to prosecutions for crimes occurring wholly within the District must fail. *See United States v. Mahdi*, 598 F.3d 883, 896 (D.C. Cir. 2010) (rejecting claim

that VICAR, 18 U.S.C. § 1959, "is facially unconstitutional as it violates the Commerce Clause";

"[I]t is impossible to see how a statute regulating conduct within the District of Columbia could

exceed congressional authority under the Commerce Clause"); *see id.* ("Even if there were some

doubt about § 1959's constitutionality outside the District of Columbia, 'we need not find the

language of [§ 1959] constitutional in all its possible applications in order to uphold its facial

constitutionality.'") (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 104 (1971)); *accord United*

*States v. Carson*, 455 F.3d 336, 368 (D.C. Cir. 2006) ("Within the District, Congress did not need

to rely on its Commerce Clause authority."). This Court should reject Workman's challenge to the

commerce predicate in the Section 231(a)(3) count, where Congress expressly targeted civil

disorders that affected commerce within the District of Columbia.

> **B.    Workman's Commerce Clause Challenge To Section 231(a)(3)
> Is Also Meritless Because Section 231(a)(3) is a Valid Exercise
> of Congress's Ability to Regulate Interstate Commerce.**

Although this Court need not reach Workman's Commerce Clause challenge to Section

231(a)(3), if it does, it should reject it. Chief Judge Boasberg, judges in other districts, and, most

recently, the Eleventh Circuit have all held that Section 231(a)(3) does not exceed Congress's

Commerce Clause authority, even when applied to conduct outside the District of Columbia.

"[T]he Court concurs with the Government and the other district courts that § 231(a)(3) contains

a jurisdictional element that ensures a sufficient connection to interstate commerce in each

application." *Mostofsky*, 579 F. Supp. 3d at 20. "Section 231(a)(3) expressly limits the statute's

sweep to instances where there is a civil disorder that affects interstate commerce and a defendant

obstructs law-enforcement officials lawfully conducting their duties incident to such disorder." *Id.*;

*see also United States v. Phomma*, 561 F. Supp. 3d at 1064–66 (D. Or. 2021) (notwithstanding

*Lopez* and *Morrison*, "§ 231(a)(3) is within Congress's Commerce Clause authority because the

statute includes an express jurisdictional element, requiring that the defendant's obstruction or

interference with a law enforcement officer or firefighter must occur 'during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce.'"); *accord United States v. Pugh,* 90 F. 4th 1318, 1326 (11th Cir. 2024);[1] *United States v. Rupert*, No. 20-cr-104, 2021 WL 1341632, at *16–20 (D. Minn. Jan. 6, 2021) (Report and Recommendation), *adopted*, 2021 WL 942101 (D. Minn. Mar. 12, 2021); *United States v. Pugh*, No. 1:20-cr-73, ECF No. 95 at 7-11 (S.D. Ala. May 13, 2021); *United States v. Wood*, No. 20-cr-56, 2021 WL 3048448, at *4-6 (D. Del. July 20, 2021); *United States v. Howard*, No. 21-cr-28, 2021 WL 3856290 (E.D. Wis. Aug. 30, 2021); *see generally United States v. Huff*, 630 F. App'x 471, 484-85 (6th Cir. 2015) (unpublished) (rejecting Commerce Clause challenge to a charge of transporting a firearm in furtherance of a civil disorder, in violation of 18 U.S.C. § 231(a)(2)).

In *United States v. Lopez*, 514 U.S. 549 (1995), the Supreme Court set forth three broad ways in which Congress may regulate under its commerce power: it may regulate use of channels of interstate commerce, it may protect persons or things in commerce, and it may address activities that have a substantial effect on commerce. *Id.* at 558-59. Workman's challenge concerns whether the third category of regulation allows Section 231(a)(3).[2]

---

[1] Workman acknowledges the Eleventh Circuit's rejection of his position in *Pugh* (although does not address any other adverse decision, including those rejecting nearly verbatim motions to what he has filed here). ECF No. 25 at 3. He seeks to distinguish *Pugh* by claiming he has raised an "as applied" challenge, not *Pugh*'s facial challenge. *Id.* The Court should not be fooled by this attempt to avoid contrary authority by repackaging the same attacks (which mirror many arguments raised in *Pugh*) as an "as applied" challenge. Workman does explain why this supposed distinction matters here: whether he labels his arguments "as applied" or "facial," they are the same arguments other courts have rejected, and they fail for the same reasons. And it is suspect, as Workman seeks to invalidate the statute in all applications as beyond Congress's commerce authority, not simply in reference to his conduct. That is a facial challenge. *See, e.g., United States v. Salerno*, 481 U.S. 739, 745 (1987) (a facial challenge asserts that "no set of circumstances exists under which the Act would be valid"). To the extent Workman does bring an as-applied challenge, moreover, it would fail, as his conduct in the District of Columbia is patently covered by Congress's plenary authority over the District, as explained below.

[2] While the government's response focuses on Workman's challenge to Section 231(a)(3) as a valid regulation of activities that "substantially affect interstate commerce" (the third category

Under *Lopez*, four factors determine whether an activity has a "substantial effect" on interstate commerce: "(1) whether the activity itself 'has anything to do with commerce or any sort of economic enterprise, however broadly one might define those terms'; (2) 'whether the statute in question contains an express jurisdictional element'; (3) 'whether there are express congressional findings or legislative history regarding the effects upon interstate commerce of the regulated activity'; and (4) 'whether the relationship between the regulated activity and interstate commerce is too attenuated to be regarded as substantial.' " *United States v. Reed*, No. 15-188, 2017 WL 3208458, at *8 (D.D.C. July 27, 2017) (quoting *Rancho Viejo, LLC v. Norton*, 323 F.3d 1062, 1068–69 (D.C. Cir. 2003)). Satisfying the jurisdictional element factor "is typically enough to satisfy the Commerce Clause." *Mostofsky,* 579 F. Supp. 3d at 16.

Workman's argument relies principally on *Lopez* and *United States v. Morrison*, 529 U.S. 598 (2000). In *Lopez* and *Morrison,* the challenged statutes contained no "jurisdictional element" that required the Government to prove that the offense conduct affected interstate commerce. *Lopez*, 514 U.S. at 561-62 (Gun Free Schools Zone Act "contains no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce," in contrast to former 18 U.S.C. § 1202(a), "which made it a crime for a felon to 'receiv[e], posses[s], or transpor[t] in commerce or affecting commerce ... any firearm'"); *Morrison*, 529 U.S. at 613 (Violence Against Women Act, "[l]ike the Gun-Free School Zones Act at issue in Lopez, … contains no jurisdictional element establishing that the federal cause of action

---

under *Lopez*)*, the government reserves arguments that Section 231 is also justified under the two other categories of permissible commerce regulation. Civil disorders endanger the channels of commerce and persons and goods in commerce. The Supreme Court has explained that "the authority of Congress to keep the channels of interstate commerce free from immoral and injurious uses has been frequently sustained, and is no longer open to question." *Caminetti v. United States*, 242 U.S. 470, 491 (1917). Congress also may act to protect interstate commerce from a wide array of threats. *Heart of Atlanta Motel, Inc.*, 379 U.S. at 256-57 (identifying threats that Congress had regulated)*.

is in pursuance of Congress' power to regulate interstate commerce"; "Congress elected to cast §

13981's remedy over a wider, and more purely intrastate, body of violent crime").

Unlike the statutes in *Lopez* and *Morrison*, Section 231(a)(3) has an "explicit jurisdictional

element" that requires the Government to prove that the offense conduct interfered with interstate

commerce. *Howard*, 2021 WL 3856290, at *11 ("defendant's reliance on *Lopez* and *Morrison* is

misplaced. The statutes struck down in those cases did not have jurisdictional requirements.

Section 231(a)(1) does."); *Wood*, 2021 WL 3048448, at *4-6 (rejecting defense claim, based on

*Morrison* and *Lopez*, that "§ 231(a)(3) unconstitutionally exceeds Congress's authority and

intrudes into the States' primary role in general law enforcement because it broadly applies to

purely local conduct and requires only an attenuated connection to interstate commerce"; "courts

have held that 'despite *Lopez* and *Morrison*, the Government need only show a minimal effect on

interstate commerce when the statute contains an explicit jurisdictional element'") (quoting *Pugh*,

1:20-cr-00073-TFM-B, ECF No. 95 at *9 and citing *United States v. Kukafka*, 478 F.3d 531 (3d

Cir. 2007) (upholding "Deadbeat Parents Act" where the statute contains an explicit jurisdictional

element limiting its reach to only interstate activity); *see also United States v. Pettaway*, 297 F.

Supp. 3d 137, 144 (D.D.C. 2018) ("The D.C. Circuit held, in *Lopez*'s wake, that the magnitude of

charged conduct's impact on interstate commerce needed to sustain a federal criminal statute's

application turns on whether the statute contains a jurisdictional element.") (citing *United States*

*v. Harrington*, 108 F.3d 1460, 1467 (D.C. Cir. 1997)).

Put another way, a statute need not criminalize only those acts that directly yield a

substantial impact on interstate commerce in every individual case. "[J]urisdictional elements

'guarantee that each prosecution is a separate, independent application of the commerce power to

regulate . . . meaning that "each case stands alone on its evidence that a concrete and specific effect

does exist." *Pettaway*, 297 F. Supp. 3d at 144 (citing *Harrington,* 108 F.3d at 1466-67). As

*Pettaway* further explained, *Lopez* "framed the relevant inquiry, in reviewing a prosecution under a statute containing a jurisdictional element, as whether 'the [conduct] in question affects interstate commerce'—not whether such conduct '*substantially* affects interstate commerce'—and instructed that such inquiry occur "on a case-by-case basis." *Id.* at 144 (citing *Lopez*, 514 U.S. at 561 (emphasis added)).

Notwithstanding the jurisdictional element, Workman persists in the argument that the acts criminalized under Section 231(a)(3) lack a sufficiently strong tie to commerce. In *Mostofsky*, Judge Boasberg methodically rejected each of these, finding:

- "when a person deliberately commits some act to obstruct, impede or interfere with those officers [who are 'attempting to quell an interference with interstate commerce'], that person is impacting interstate commerce";

- "[d]espite the actus reus being noneconomic. . . § 231(a)(3) may be upheld because [it] 'proscribe[s] conduct interfering with or affecting interstate commerce' in the form of either hurting a victim at work or disrupting efforts to contain a civil disorder that affects interstate commerce" (cleaned up)

- "'the incident to and during' language in § 231(a)(3) does not suggest that the 'act' or 'lawful performance of [an officer's] official duties' is somehow minimally related to the civil disorder. Rather, the most natural reading of the phrase is to indicate that those activities 'arise[ ] out of' or occur during the civil disorder, not that they are some tangential consequence far downstream from the disorder itself";

- "it is often the case that the circumstances around an act are what must affect interstate commerce even though the act itself is not commercial." (citing *Harrington*, 108 F.3d at 1469–70 ("We do not rest our holding on the understanding that the defendant was 'engaged in interstate commerce' when he participated in the robbery of the restaurant[;] ... rather, we rely on the undisputed fact that the restaurant was engaged in interstate commerce."));

- rejecting the claim that "the jurisdictional element is insufficient as it 'does not require a substantial effect on interstate commerce, but instead requires a civil disorder that affects commerce 'in any way or degree'" because the "substantiality" requirement does not apply in the context of determining what quantum of evidence is required to satisfy statutory interstate commerce jurisdictional elements" (citing *Harrington*, 108 F.3d at 1465); and further observing that a jurisdictional element substitutes for legislative findings regarding commerce (citing *Terry v. Reno*, 101 F.3d 1412, 1418 (D.C. Cir. 1996)); and

- rejecting the claim that "§ 231(a)(3) regulates criminal conduct without a sufficiently close

connection with a commercial good or activity," observing that " '*Morrison* did not bar regulation of noneconomic conduct that affects interstate commerce in individual instances,'" (citing, *inter alia, Pettaway*, 297 F. Supp. 3d at 147–48) and that "Section 231 requires precisely a showing that the regulated conduct 'interferes with or otherwise affects commerce'."

*Mostofsky*, 579 F. Supp. 3d at 18-20.

The other on-point decisions agree. The Eleventh Circuit recently held that "the jurisdictional element of interstate commerce need not link directly to the criminalized act itself as long as the object of the criminal act" – the civil disorder—"is sufficiently connected to interstate commerce." *Pugh*, 90 F. 4th at 1327; *see also Phomma*, 561 F.Supp.3d at 1065–66; *Howard*, 2021 WL 3856290, at *11; *Wood*, 2021 WL 3048448, at *6. "[U]nder the Commerce Clause, Congress may proscribe violent conduct when such conduct interferes with or otherwise affects commerce over which Congress has jurisdiction." *United States v. Hill*, 927 F.3d 188, 193 (4th Cir. 2019), *cert. denied*, 141 S. Ct. 272 (2020) (federal Hate Crimes Prevention Act of 2009, 18 U.S.C. § 249(a)(2), "may be constitutionally applied to an unarmed assault of a victim engaged in commercial activity at his place of work"). And contrary to Workman's contention that Congress's power under the Commerce Clause applies only to conduct that has a "substantial effect" on interstate commerce, "Congress may regulate violent conduct interfering with interstate commerce even when the conduct itself has a 'minimal' effect on such commerce." *Id.* (citing *Taylor v. United States*, 579 U.S. 301, 309 (2016) (upholding Hobbs Act conviction for robbery of a drug dealer; "where the target of a robbery is a drug dealer, proof that the defendant's conduct in and of itself affected or threatened commerce is not needed. All that is needed is proof that the defendant's conduct fell within a category of conduct that, in the aggregate, had the requisite effect.")

## II.    Workman's First Amendment Challenge to Section 231 Is Meritless.

Workman next contends that Section 231(a)(3) is facially overbroad under the First Amendment, a claim this Court rejected in *Nordean,* 579 F. Supp. 3d at 56-58*.* He also argues that

Section 231(a)(3) violates the First Amendment either because the statute's text manifests viewpoint discrimination or because the statute was passed for the purpose of discriminating against certain viewpoints. Under either formulation, his challenge fails.

### A.   Section 231(a)(3) is Not Overbroad.

As this Court and every other judge in this district who has addressed this precise claim has held, Workman's overbreadth claim fails. *Nordean*, 579 F. Supp. 3d at 57-58; *see also, e.g.*, *McHugh,* 583 F. Supp. 3d at 28-29; *United States v. Mock*, No. 21-CR-444 (JEB), 2023 WL 3844604, at *5 (D.D.C. June 6, 2023); *GossJankowski*, 2023 WL 130817, at *7; *United States v. Fischer*, No. 21-CR-234 (CJN), 2022 WL 782413, at *3-4 (D.D.C. March 15, 2022) (reversed on other grounds); *Williams*, 2022 WL 2237301, at *4-5. A criminal law is facially overbroad only if "'a substantial number' of its applications are unconstitutional, 'judged in relation to the statute's plainly legitimate sweep.'" *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 n.6 (2008) (quoting *New York v. Ferber*, 458 U.S. 747, 769-71 (1982)); *see also United States v. Williams*, 553 U.S. 285, 293 (2008); *Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972). A facial overbreadth challenge faces a steep climb when the statute focuses mainly on conduct, as § 231(a)(3) does. *See Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (noting the "substantial social costs created by the overbreadth doctrine when it blocks application of a law to ... constitutionally unprotected conduct"). Refusing to enforce a statute because of overbreadth concerns is "strong medicine," and courts will refuse to enforce the statute on such grounds "only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973).

As Judge Berman Jackson has explained, "First, the statute plainly covers conduct, not speech, as it criminalizes 'any *act* to obstruct, impede, or interfere with' a law enforcement officer engaged in the performance of official duties, and the terms 'obstruct, impede, or interfere with' are all plainly understood and must be supported by the facts in any particular case." *Id*. (emphasis

added). "Although some 'acts' could also serve an expressive function, and one could come up with a hypothetical scenario in which the alleged interference involved particularly obstreperous speech, the law does not require dismissing a charge merely because there is a possibility that the provision could reach some constitutionally protected activity." *Id*. "Since section 231(a)(3) does not 'make unlawful a substantial amount of constitutionally protected conduct,' it is not overbroad on its face." *Id*. (citing *City of Houston v. Hill*, 482 U.S. 451, 459 (1987)). Courts earlier made the same observation: "The words 'any act' imply that the statute is directed towards conduct, not speech. In fact, Section 231(a)(3) does not even mention speech, and it simply does not prohibit peaceful expression or association." *Nordean*, 579 F. Supp. 3d at 58.

The Eighth Circuit's decision in *Mechanic*, rejecting an overbreadth challenge to § 231(a)(3), is particularly instructive. After noting that the statutory language "applies only to a person who acts to impede, obstruct, or interfere with an official described in the statute," that court held that "conduct involved here [the massing of a mob that threw stones at an R.O.T.C. building on a college campus to protest the Viet Nam war, followed by rock and bottle throwing at firemen who arrived to quell the disturbance] is not entitled to constitutional protection." 454 F.2d at 852. "The First Amendment has not been extended to protect rioting, inciting to riot, or other forms of physical violence." *Id*. (citing *Foran*, 411 F.2d at 937). Thus, § 231(a)(3) "does not purport to reach speech of any kind. It reaches only acts to impede, obstruct, or interfere with police officers and firemen." *Id*. "[I]t is not just any public disturbance which is the subject of the section, but only public disturbances which (1) involve acts of violence (2) by assemblages of three or more persons, and which (3) cause immediate danger of or result in injury to (4) the property or person of any other individual." *Id*.

Apparently seeking to identify "a substantial number" of unconstitutional applications of Section 231(a)(3), Workman contends the statute's prohibitions would apply to someone who

"flips off officers to distract or to encourage resistance," or "records police activity with a cell phone." ECF No. 25 at 28. He also contends that "civil disorder" which is "any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of ... injury to the property," is "extremely far-reaching." *Id.* at 29. This would apply, he contends, to "three teenagers whose skateboarding damages property." *Id.*

Workman's examples do not demonstrate that Section 231(a)(3) is unconstitutionally overbroad. "[T]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984); *see also Howard*, 2021 WL 3856290, at *11 (rejecting overbreadth claim that "the government perhaps could charge someone who yelled at an officer during a civil disorder and could argue that the yelling was an 'act' that 'attempted to obstruct' an officer performing her lawful duties"). Rather, a defendant must show a "realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *Members of City Council of City of Los Angeles*, 466 U.S. 789, 801 (1984). Workman identifies no such cases, and no wonder. Laws like § 231(a)(3) that are "not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating)" are far less likely to present such a danger. *Hicks*, 539 U.S. at 124. Indeed an "overbreadth challenge" to such a law will "[r]arely, if ever ... succeed." *Id.*

Workman has given this Court no reason to depart from the unanimous holdings of other judges in this district and elsewhere that Section 231(a)(3) is not unconstitutionally overbroad.

> **B.    Section 231(a)(3) Does Not Target Protected Speech, and Workman Fails to Show it Was Passed for This Purpose.**

Workman argues that Section 231(a)(3) triggers, and does not survive, strict scrutiny, either because it is not content neutral or because it was passed for a discriminatory reason. But Section

231(a)(3) *is* neutral on its face. And Workman's claim that one Senator (who did not even vote for the final bill containing Section 231(a)(3)) was motivated by animus does not carry his burden to demonstrate that Congress as a whole acted with discriminatory intent.

### 1.    Section 231(a)(3) is Content-Neutral.

Workman argues that § 231(a)(3) is a content-based restriction that "singles out forms of expression that contain messages that criticize, challenge, insult, or object to the actions of law enforcement officers." ECF No. 25 at 32.  It is not.

As the Supreme Court has explained, a "regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). A law may be content-based if the statute makes facial distinctions based upon a speaker's message or if the law was passed for a particular content-related purpose. *Id.* at 163-64. There is a strong "presumption of good faith" on the part of legislators. *Miller v. Johnson*, 515 U.S. 900, 916 (1995).

To determine whether a regulation is a content-based restriction of speech, a court considers whether the regulation, "on its face, draws distinctions based on the message a speaker conveys." *Reed,* 576 U.S. at 163 (citation omitted). If the law is facially content-neutral, the court then considers whether the regulation "cannot be 'justified without reference to the content of the regulated speech[ ]' or [ ] [was] adopted by the government 'because of disagreement with the message [the speech] conveys.' " *Id.* at 164 (alteration in original) (quotation marks omitted) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

As the Eleventh Circuit recently found in rejecting an identical challenge, "Section 231(a)(3) is not a content-based regulation of speech. If it affects speech at all, Section 231(a)(3) is content-neutral." *Pugh,* 90 F.4th at 1332. *Pugh* explained that Section 231(a)(3) criminalizes "any act to obstruct, impede, or interfere" with officers, and does not "draw[ ] distinctions based

on the message" conveyed by the relevant act. *Id.* at 1332 (citing *Reed*, 576 U.S. at 163). It applies "as long as the act is 'to obstruct, impede or interfere with any fireman or law enforcement officer' performing official duties." *Pugh,* 90 F. 4th at 1332. *Pugh* further rejected the claim that Section 231(a)(3) singles out expressions critical of law enforcement, observing that "the statute does not distinguish between acts that are critical of law enforcement and acts that are neutral toward, or favor, law enforcement." *Id.*; *accord Howard*, 2021 WL 3856290, at *7 (*"Section 231(a)(3) does not . . . punish an individual for holding a particular point of view"*).

In other words, to the extent that Section 231(a)(3) criminalizes expressive conduct, it does so based on whether the conduct obstructs, impedes, or interferes with officers during a civil disorder. 18 U.S.C. § 231(a)(3). Whether a person pushes over a barricade while shouting, "I back the blue!" or "Defund the police!", the statute treats them the same. *Cf. McCullen v. Coakley*, 573 U.S. 464, 479 (2014) (holding that a statute was not a content-based restriction because "[w]hether petitioners violate[d] the [a]ct 'depend[ed]' not 'on what they say,' . . . but simply on where they say it" (citation omitted) (*quoting Holder v. Humanitarian L. Project*, 561 U.S. 1, 27 (2010)).

### 2.    Workman Fails to Show that Congress Passed Section 231(a)(3) to Censor Particular Content.

Workman, like Pugh, "has not successfully established that Section 231(a)(3) was enacted to suppress expressive content." *Pugh,* 90 F. 4th at 1332. Repeating arguments and citing much of the same evidence found unpersuasive in *Pugh, Howard,* and *Wood,* Workman argues that Senator Long, who sponsored Section 231(a)(3), was motivated by "suppressing the content of expression related to civil rights and racial justice." ECF No. 25 at 36. Senator Long's enmity toward Martin Luther King and other heroes of the civil rights movement, the argument goes, should invalidate the use of the statute against Donald Workman.

As Workman correctly observes, Senator Long made several highly offensive remarks,

some years before Section 231(a)(3) was passed. While the government appreciates Workman's sensitivity to evidence of racial prejudice in American history, Senator Long's views cannot be ascribed to the entire Congress that passed Section 231(a)(3). *See Pugh*, No. 20-cr-73-TFM-B, ECF No. 95 at 15 ("Even assuming that Senator Long did intend what Pugh asserts, the negative intentions of a single senator cannot be imputed to all proponents of the bill"), *aff'd*, 90 F. 4th 1318 (2024). In fact, "as shown in the ultimate vote, the bill passed with Senator Long voting in the negative and other high-profile civil rights supporters voting for the bill," *id.* including Senators Robert Kennedy (D–N.Y.) and Everett Dirksen (R–Ill.). 114 Cong. Rec. 5992 (1968).

That is the fatal flaw in Workman's argument. "What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it." *United States v. O'Brien*, 391 U.S. 367, 384 (1968); *see also League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 939 (11th Cir. 2023) ("[A] statement or inquiry by a single legislator would constitute little evidence of discriminatory intent on the part of the legislature.")

While the Court can stop there, a broader look at this statute's legislative history paints a different picture than the one Workman presents. What eventually became Section 231(a)(3) was enacted as part of bipartisan civil rights legislation following a series of civil disorders in the 1960s. The legislation was designed to address, among other things, (1) racial and religious discrimination in connection with federally protected activities; (2) the rights of Native Americans; and (3) racial discrimination in housing. Pub. L. No. 90-284, 82 Stat. 73-92 (1968). Far from being enacted to counter civil rights legislation, this legislation was intended to address both the evils of racial discrimination and civil unrest. See 114 Cong. Rec. 9608–09 (1968). As Representative Clarence "Bud" Brown (R-Ohio) explained:

> We need legislation to prevent inference with those pursuing their own civil rights or attempting to educate others about their rights. But we also need legislation to prevent inciting of violence in the name of civil rights or under whatever pretext.

> . . . For all of these reasons — but with emphasis on the continuing need to do justice, to discourage racial discrimination, to bring new hope to all our people — I urge colleagues to approve the resolution and to pass the bill.

114 Cong. Rec. 9608–09 (1968).

Workman also fails to mention that after Senator Long stated that Section 231 "would be used to put down uprisings of the Ku Klux Klan, just as it would be used to put down an uprising caused by Rap Brown,"[3] Senator Robert F. Kennedy (D-New York) responded, "I shall support the Senator from Louisiana. I believe this would be very important legislation. It would be a historic day in the Senate of the United States, and I congratulate the Senator from Louisiana." 114 Cong. Rec. 5541 (1968) (statements of Sens. Long and Kennedy). And, as noted above, Senator Kennedy ultimately voted for the legislation; Senator Long did not.

Workman's focus on just the statements of Senator Long, and silence on the rest of the statute's legislative history, is not the proper method of analysis. *Pugh*, which rejected this argument, is no outlier: the government is not aware of any courts who have invalidated Section 231(a)(3) based on this claim. *See, e.g., United States v. Howard,* No. 21-CR-28-PP, 2021 WL 3856290; *Wood*, No. 20-56 MN, 2021 WL 3048448, *4; Apr. 7, 2023 Minute Entry, *United States v. Wren*, 21-cr-599 (RBW) (denying motion making same argument that Section 231(a)(3) was passed to discriminate against speech supporting civil rights).

Finally, even if Section 231(a)(3) regulated speech to a degree that a level of scrutiny applied to this analysis, the Court should apply intermediate scrutiny under *O'Brien*, 391 U.S. 367, not strict scrutiny. This would be the appropriate level of scrutiny because Section 231(a)(3) regulates conduct that only incidentally affects speech and applies irrespective of any expressive

---

[3] H. Rap Brown, who later changed his name to Jamil Abdulla Al-Amin, was a controversial African American figure who, at times, supported the use of violence. *See, e.g., AlAmin v. Shartle*, No. 12-cv-1688, 2017 WL 6596602 (N.D. Ga. 2017); *United States v. Brown*, 539 F.2d 467 (5th Cir. 1976).

content. Section 231(a)(3) easily survives intermediate scrutiny because it is narrowly tailored to advance important governmental interests in enabling police and firefighters to protect channels of commerce and federally protected functions from being disrupted by civil disorders. *See Ward*, 491 U.S. at 791 ("even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." (quoting *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293 (1984)).

### III.    Section 231(a)(3) is Not Unconstitutionally Vague.

Count One provides fair notice to Workman of the conduct it punishes and is therefore not unconstitutionally vague. Many judges in this district have rejected similar challenges to Section 231(a)(3). *See e.g.*, *Nordean*, 579 F. Supp. 3d at 57-58 (D.D.C. 2021); *Mock*, 2023 WL 3844604, at *5; *GossJankowski*, 2023 WL 130817, at *11-13; *Fischer*, 2022 WL 782413, at *2-3 (reversed on other grounds); *United States v. Bingert*, 605 F. Supp. 3d 111, 128-130 (D.D.C. 2022); *McHugh*, 583 F. Supp. 3d at 26-28; *Williams*, 2022 WL 2237301, at *4-5.[4]

The "void for vagueness" doctrine prevents the enforcement of a criminal statute that is "so vague that it fails to give ordinary people fair notice of the conduct it punishes" or is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). To ensure fair notice, "generally, a legislature need do nothing more than enact and publish the law, and afford the citizenry a reasonably opportunity to familiarize itself with its terms and to

---

[4] Several courts outside this circuit have also rejected similar challenges to Section 231(a)(3). *See e.g.*, *Phomma*, 561 F. Supp. 3d at 1069-70; *Rupert*, 2021 WL 1341632, at *16-20; *Wood*, 2021 WL 3048448; *Howard*, 2021 WL 3856290, at *12-14.

comply." *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (citation omitted).

A statute is not unconstitutionally vague simply because its applicability is unclear at the margins, *United States v. Williams*, 553 U.S. 285, 306 (2008), or because reasonable jurists might disagree on where to draw the line between lawful and unlawful conduct in particular circumstances, *Skilling v. United States*, 561 U.S. 358, 403 (2010). A provision is impermissibly vague only if it requires proof of an "incriminating fact" that is so indeterminate as to invite arbitrary and "wholly subjective" application. *Williams*, 553 U.S. at 306; *see Smith v. Goguen*, 415 U.S. 566, 578 (1974). A statutory provision is "not rendered unconstitutionally vague because it 'do[es] not mean the same thing to all people, all the time, everywhere.'" *Bronstein*, 849 F.3d at 1107 (quoting *Roth v. United States*, 354 U.S. 476, 491 (1957)). A statute is instead vague where it fails to specify any "standard of conduct . . . at all." *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971). A law is not vague because it "call[s] for the application of a qualitative standard . . . to real-world conduct; 'the law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree.'" *Johnson*, 576 U.S. at 603-04 (quoting *Nash v. United States*, 229 U.S. 373, 377 (1913)).

There is a strong presumption that a statute is not vague. *See United States v. Nat'l Dairy Products Corp.*, 372 U.S. 29, 32 (1963). Other courts in this district have recognized that high bar. *See United States v. Gonzalez*, No. 20-CR-40 (BAH), 2020 WL 6342948, at *7 (D.D.C. Oct. 29, 2020); *see also United States v. Harmon*, No. 19-CR-395 (BAH), 2021 WL 1518344, at *4 (D.D.C. Apr. 16, 2021) (finding that the defendant did not meet the "stringent standard" to prevail on a Rule 12 vagueness motion).

Section 231(a)(3) is not unconstitutionally vague. It provides sufficient notice of the conduct it prohibits. The terms with which Workman takes issue – "any act to obstruct, impede, or interfere" and "incident to and during the commission of a civil disorder" – do not carry the

potential for misunderstanding or make the statute "so standardless that it invites arbitrary enforcement." *Johnson*, 5576 U.S. at 595; *see also Nordean*, 579 F. Supp. 3d at 57 (observing that "there are specific fact-based ways to determine whether a 'defendant's conduct interferes with or impedes others,' or if a law enforcement officer is performing his official duties 'incident to and during' a civil disorder."). Like the challenge denied by Judge Bates in *McHugh*, Workman's motion "misunderstand[s]" vagueness: "There is a crucial difference between reasonable people differing over the meaning of a word and reasonable people differing over its application to a given situation – the latter is perfectly normal, while the former is indicative of constitutional difficulty." *McHugh*, 583 F. Supp. 3d at 27.

Contrary to Workman's arguments, the statute's terms are thus quite different from statutory terms that courts have found to be vague, such as statutes that turn on subjective judgments of whether a defendant's conduct was "annoying" or "indecent," or those that depend on the victim's state of mind. *See Nordean*, 579 F. Supp. 3d at 57; *see also Williams*, 553 U.S. 306 (citing *Coates*, 402 U.S. at 614); *United States v. Kozminski*, 487 U.S. 931, 949-50 (1988). "An ordinary person would have an intuitive understanding of what is proscribed by a ban on obstructing, impeding, or interfering with law enforcement." *McHugh*, 583 F. Supp. 3d at 27. In addition, Section 231(a)(3) is not unique; many state and federal statutes likewise criminalize "obstructing" the government's efforts to enforce the law and maintain public order, and they have been upheld. *See, e.g.*, 26 U.S.C. § 7212(a) (prohibiting obstructing or impeding the administration of the tax laws); 18 U.S.C. § 2237 (making it unlawful to "oppose, prevent, impede, intimidate or interfere with" a maritime investigation); *United States v. Brice*, 926 F.2d 925, 930-31 (9th Cir. 1991) (rejecting overbreadth and vagueness challenges to 41 C.F.R. § 101-20.305, regulation prohibiting impeding or disrupting government duties).

Workman also claims that the phrase "incident to and during the commission of a civil

disorder" is vague because he cannot tell whether the statute requires an individual to have participated in the civil disorder or if it is sufficient that he be in the general vicinity of the event. ECF No. 25 at 40. This argument is also meritless. "The crime set forth by the statute is not mere presence at a civil disorder . . . but an act committed during the course of such a disorder, so 'civil disorder' simply describes the environment in which the act must be committed in order to be subject to prosecution under § 231(a)(3)." *Mechanic*, 454 F.2d at 853; *see also Howard*, 2021 WL 3856290, at *14 ("[T]he statute does not require the government to prove that the defendant created the civil disorder, or that he was participating in the civil disorder."). Contrary to Workman's argument that any "tumultuous public gathering" could qualify (ECF No. 25 at 40), "it is not just any public disturbance which is the subject of the section, but only public disturbances which (1) involve acts of violence (2) by assemblages of three or more persons, and which (3) cause immediate danger of or result in injury to (4) the property or person of any other individual." *Mechanic*, 454 F.2d at 853; *see* 18 U.S.C. § 231(1); *cf. United States v. Huff*, 630 F. App'x 471, 489 (6th Cir. 2015) (unpublished) (rejecting vagueness challenge to "civil disorder" term in 18 U.S.C. § 231(a)(2) and citing definition in 18 U.S.C. § 231(1)). *See also McHugh*, 583 F. Supp. 3d at 26, n.22.

And even if a broad range of public gatherings could be deemed "civil disorders," Section 231(a)(3) criminalizes only particular conduct, not mere participation in such a disorder. The "civil disorder" language operates to *narrow* the situation where the statute may apply – unlike other statutes, which criminalize acts of obstruction, wherever they may take place. *See* 26 U.S.C. § 7212(a) (criminalizing obstruction of tax laws). The requirement that the *actus reus* take place in the context of a civil disorder does not make Section 231 vague; to the contrary, it limits its application.

Workman's vagueness claim also fails because his conduct clearly falls within the ambit

of Section 231. "[A]n individual "who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." (citing *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18-19 (2010) (cleaned up)); *see also Nordean*, 579 F. Supp. 3d at 57 (same); *see generally Wood*, 2021 WL 3048448, at *9 ("Defendant does not have standing to bring a facial vagueness challenge" to Section 231(a)(3) because he failed to "demonstrate that [the statute] is vague as applied to his conduct"). The January 6, 2021 attack on the United States Capitol was clearly a "civil disorder," not just some "tumultuous public gathering" to which the police were called. And there is no question that Workman and Clark participated in the disorder through, among other things, their assault on an officer who attempted to prevent them from moving further onto restricted grounds, and their efforts to push through lines of officers on the west side of the Capitol grounds. Workman and Clark were not bystanders; there were active participants in a civil disorder.  Tracking the statutory language, Count One accordingly alleges that Workman "commit[ted] an act to obstruct, impede, and interfere with a law enforcement officer." The statute is "sufficiently clear that a normally intelligent person could ascertain its meaning and would be given fair notice of whether or not his conduct is forbidden." *Mechanic*, 454 F.2d at 854.

Workman's argument that Section 231(a)(3) is vague because it lacks an express scienter requirement or *mens rea* is also wrong. Workman ignores the fact that Section 231(a)(3) requires *intent*, which narrows its scope. *See Williams*, 553 U.S. at 294 (focusing on scienter requirement in finding that a statute was not overbroad); *McHugh*, 583 F. Supp. 3d 24-26 (finding that Section 231(a)(3) includes an intent requirement). The statute requires proof that the "act" was done "to obstruct, impede, or interfere" with a law enforcement officer, *i.e.*, the defendant's purpose or intent in performing the "act" must be to obstruct, impede, or interfere. *See Mechanic*, 854 F.2d at 854 (construing Section 231(a)(3) to include an intent requirement).

Judge Berman Jackson reached the same result in *Williams*, 2022 WL 2237301, at *6-7 (D.D.C. June 22, 2022). She noted that "a *scienter* requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Id*. at *7 (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982)). She concluded that § 231(a)(3) "only criminalizes acts performed 'to obstruct, impede, or interfere with' a law enforcement officer," "in other words, the statute requires obstructive intent." *Id*. *See also Nat'l Mobilization Comm. to End War in Viet Nam v. Foran*, 411 F.2d 934, 937 (7th Cir. 1969) ("It is true that section 231(a)(3) does not specifically refer to intent, but it only applies to a person who 'commits or attempts to commit any act to obstruct, impede, or interfere' with firemen or law enforcement officers."); *Mechanic*, 454 F.2d at 854 (agreeing with *Foran* "that § 231(a)(3) must be construed to require intent").

And even if the statute lacked an express scienter requirement, courts, "generally interpret [] criminal statutes to include broadly applicable scienter requirements, even where the statute by its terms does not contain them." *Elonis v. United States*, 575 U.S. 723, 734 (2015) (citation omitted); *see also United States v. Cassel*, 408 F.3d 622, 634 (9th Cir. 2005) ("[E]xcept in unusual circumstances, we construe a criminal statute to include a *mens rea* element even when none appears on the face of the statute."). Workman's contrary argument is wrong.

## IV.     The Indictment Comports with Notice and Presentment Requirements

Finally, Workman asserts the indictment is deficient under notice or presentment requirements because it contains only "conclusory allegations." ECF No. 25 at 44. Once again, Workman's claim is without merit, and courts have rejected it. *See, e.g., Williams*, 2022 WL 2237301 at *7.

An indictment is sufficient if it contains the elements of the charged offense and enough detail to allow a defendant to prepare a defense and invoke the Double Jeopardy Clause if

necessary. *Hamling*, 418 U.S. at 117–19 ; *United States v. Resendiz-Ponce*, 549 U.S. 102, 108–10 (2007)*; United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014) ("the validity of an indictment is not a question of whether it could have been more definite and certain. Rather, to be sufficient, an indictment need only inform the defendant of the precise offense of which he is accused so that he may prepare his defense and plead double jeopardy in any further prosecution for the same offense.") (cleaned up).

"[B]y using the statutory language and specifying the time and place of the offense," an indictment provides both "fair notice" and protection against future prosecution. *Williamson*, 903 F.3d at 130 . "[A]n indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013) (internal quotation omitted). "[N]either the Constitution, the Federal Rules of Criminal Procedure, nor any other authority suggests that an indictment must put the defendant on notice as to every detail considered by the grand jury. Further, indictments 'must be read to include facts which are necessarily implied by the specific allegations made.'" *United States v. Cisneros*, 26 F. Supp. 2d 24, 46 (D.D.C. 1998) (quoting *United States v. Silverman*, 430 F.2d 106, 111–12 (2d Cir. 1970)); *see also United States v. Berger,* 473 F.3d 1080, 1103 (9th Cir. 2007) (explaining that an indictment "should be read in its entirety, construed according to common sense, and interpreted to include facts which are necessarily implied."); *see also Nordean*, 579 F. Supp. 3d at 56  (same).

There is no reason to examine what facts the grand jury received in this case, or what facts could have been added to the indictment, because the indictment properly alleges all elements of the charges. Moreover, the extensive disclosures in this case make clear what Workman is charged with doing. In the event there is any lingering confusion about the particular facts underlying the charged offense, the remedy would be a request for a bill of particulars, not dismissal. Workman

criticizes the January 6 indictments as "assembly line," ECF No. 25 at 46, but those commonalities result from the tragic fact that an unprecedented number of similar crimes occurred during the assault on the Capitol. It is no sign of insufficiency. Workman's motion to dismiss fails.

## CONCLUSION

For the foregoing reasons, this Court should deny Workman's Motion to Dismiss Count One of the Indictment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:     */s/  Melanie Krebs-Pilotti*
MELANIE KREBS-PILOTTI
Antitrust Div. Trial Attorney- detail to USAO-DC
601 D St., N.W.
Washington, D.C. 20530
Cal Bar No. 241484
Melanie.krebs-pilotti2@usdoj.gov
(202) 870-7457

*/s/ Nathaniel K. Whitesel*
NATHANIEL K. WHITESEL
Assistant United States Attorney
DC Bar No. 1601102
601 D Street NW
Washington, DC 20530
nathaniel.whitesel@usdoj.gov
(202) 252-7759